RICHARD LAPOINTE *v.* COMMISSIONER
OF CORRECTION
(AC 33452)

Alvord, Bear and Pellegrino, Js.

Argued May 18—officially released October 9, 2012

*Paul Casteleiro*, pro hac vice, with whom was *W. James Cousins*, for the appellant (petitioner).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, chief state's attorney, *Michael O'Hare*, senior assistant state's attorney, and *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

ALVORD, J. The petitioner, Richard Lapointe, appeals from the judgment of the habeas court denying his second amended petition for a second writ of habeas corpus. On appeal, the petitioner claims that the court improperly rejected his actual innocence and ineffective assistance of counsel claims. We conclude that the court properly determined that the petitioner failed to prove his actual innocence claim, but we agree with the petitioner that the state's suppression of certain material evidence deprived him of a fair trial and that he was prejudiced by his prior habeas counsel's failure to pursue that issue at the first habeas proceeding. Accordingly, we reverse in part the judgment of the habeas court and order a new trial.

The record reveals the following facts and procedural history. On March 8, 1987, the petitioner, his wife and their son visited the victim, Bernice Martin, who was his wife's eighty-eight year old grandmother, from approximately 2 p.m. to 4 p.m. at her apartment in Manchester. It was an approximate ten to fifteen minute

walk from where the petitioner and his family lived to the victim's apartment. At approximately 5:45 p.m. that afternoon, Nathalie M. Howard, the victim's daughter, was driving through the neighborhood. She saw the victim walking from her apartment toward a garbage can. Later that evening, Howard telephoned the victim twice, but there was no response. She first called at approximately 7:55 p.m. and tried again shortly after 8 p.m. Being concerned, Howard telephoned the petitioner's residence, and the petitioner offered to walk over to the victim's apartment to check on her well-being.

At 8:27 p.m. that evening, the petitioner dialed 911 to report a fire at the victim's apartment. Manchester firefighters responded almost immediately and removed the victim from the smoke-filled apartment. When brought outside, the victim's body was partially clothed. Strips of fabric had been knotted together and tied tightly around her neck. She also had other fabric tied loosely about her wrists and her abdomen. Paramedics were unable to resuscitate the victim at the scene. She was transported to Manchester Hospital and was pronounced dead shortly after her arrival.

The associate medical examiner, Arkady Katsnelson, performed an autopsy on the victim and determined that she had suffered a three inch deep stab wound to her abdomen and ten less severe stab wounds to her back. He also determined that she had been asphyxiated by pressure to the right side of her neck with a blunt object; she was not manually strangled. Katsnelson observed lacerations and contusions to the victim's vaginal area as well as premortem first and second degree burns on various parts of her body. His conclusion as to the cause of death was a combination of asphyxia by strangulation and smoke inhalation.

The police investigation of the victim's homicide remained open and unresolved for more than two years.

In March, 1989, the case was reassigned to Detective Paul Lombardo. Lombardo decided to reinterview individuals who previously had given statements and asked the petitioner to come to the police station for further questioning on July 4, 1989. The petitioner arrived at the station shortly before 4 p.m. While the petitioner was being interrogated by Lombardo, Detective Michael Morrissey went to the petitioner's home and interviewed his wife, Karen Lapointe, now Karen Martin.[1] Unbeknownst to Karen Martin, Morrissey was wearing a hidden microphone, and their conversation was being monitored and recorded. When Morrissey's two hour interview with Karen Martin concluded, he returned to the police station. By that point in time, the petitioner had given two written statements to Lombardo. The statements, however, lacked detail, and Lombardo asked Morrissey to continue the petitioner's interrogation. Morrissey obtained a third written statement from the petitioner. After more than nine and one-half hours at the police station, the petitioner was told to return to his home. An arrest warrant was issued, and the petitioner was taken into custody on July 5, 1989.

The petitioner was convicted by a jury of capital felony, arson murder, felony murder, murder, arson in the first degree, assault in the first degree, sexual assault in the first degree, sexual assault in the third degree and kidnapping in the first degree.[2] The petitioner was sentenced to life in prison without the possibility of release. On direct appeal, the petitioner claimed that the trial court improperly (1) failed to suppress the oral

[1] The marriage of Karen Martin and the petitioner was dissolved on June 18, 1991, which was prior to his criminal trial in 1992.

[2] "The [petitioner's] convictions of arson murder, felony murder, murder, sexual assault in the first degree and sexual assault in the third degree were combined with his conviction on the capital felony count for purposes of sentencing in order to comport with constitutional double jeopardy protections." *State* v. *Lapointe*, 237 Conn. 694, 695 n.1, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

and written statements he gave to the Manchester police officers, (2) concluded that the police were not required to record electronically all confessions of detained suspects when feasible and (3) found that a state's witness was unavailable at trial and admitted an audio recording of that witness' testimony from a prior hearing. Our Supreme Court affirmed the judgment of conviction. *State* v. *Lapointe*, 237 Conn. 694, 695–96, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

Following his unsuccessful appeal, the petitioner's first habeas counsel, Henry Theodore Vogt, filed a petition for a writ of habeas corpus. Vogt filed several amendments to the petition, and the matter came to trial on February 23, 2000. The petitioner's claims before the first habeas court were as follows: (1) actual innocence premised on the inability of the petitioner physically and intellectually to carry out and to conceal the crimes for which he had been convicted; (2) prosecutorial impropriety in suppressing a notebook that contained Lombardo's notes from the homicide investigation; (3) discrimination by the state on the basis of the petitioner's physical and mental disabilities; (4) ineffective assistance of trial counsel, Attorneys Patrick Culligan and Christopher Cosgrove, for their failure, inter alia, to procure the Lombardo notebook, to retain appropriate experts for the defense at trial and to argue that men's gloves and certain hairs of unknown origin that had been found at the crime scene demonstrated that the petitioner was innocent of the charged crimes; and (5) ineffective assistance of appellate counsel.

After Vogt filed his posttrial brief, Attorney W. James Cousins attempted to file an appearance on behalf of the petitioner in lieu of Vogt's appearance. Vogt objected

pursuant to Practice Book § 3-8.[3] Before the court ruled on Vogt's objection, Cousins filed several motions. Cousins moved to open the evidentiary portion of the trial, moved to admit Paul Casteleiro, an attorney licensed to practice law in New Jersey, as counsel pro hac vice and moved to strike Vogt's posttrial brief. *Lapointe* v. *Commissioner of Correction*, 67 Conn. App. 674, 677, 789 A.2d 491, cert. denied, 259 Conn. 932, 793 A.2d 1084 (2002). Ultimately, the first habeas court ruled that Vogt would remain in the case to file a reply to the respondent's posttrial brief, if he chose to do so, but that his services as counsel to the petitioner would be concluded upon the filing of that reply. Id., 677–78. Further, the court allowed the pleadings that had been filed prematurely by Cousins to remain as part of the court file, granted the motion to admit Casteleiro pro hac vice and denied the request to present additional evidence. Id., 678.

After concluding that the petitioner "failed to prove by the appropriate standards" any of the five claims in his petition, the first habeas court, *Freed, J.*, dismissed his first petition for a writ of habeas corpus. The petitioner appealed from the judgment of the first habeas court. Then represented by Cousins and Casteleiro, the petitioner did not contend that the first habeas court improperly dismissed the petition on the basis of the evidence that had been presented to that court. Rather, the petitioner claimed that the first habeas court improperly denied his multiple motions to open the evidentiary portion of the first habeas hearing and failed to grant him a new trial because Vogt had rendered ineffective assistance during that first habeas trial.

---

[3] Practice Book § 3-8 provides in relevant part: "Unless a written objection is filed within ten days after the filing of an in-lieu-of appearance, the appearance or appearances to be replaced by the new appearance shall be deemed to have been withdrawn and the clerk shall make appropriate entries for such purpose on the file and docket. . . ."

*Lapointe* v. *Commissioner of Correction,* supra, 67 Conn. App. 678. This court concluded that the first habeas court did not abuse its discretion in refusing to allow additional evidence after the hearing had concluded; id., 679; and further determined that a claim of ineffective assistance of habeas counsel was not properly before the court because an appellate tribunal cannot find facts. Accordingly, the judgment of the first habeas court was affirmed. Id., 679–81.

In August, 2002, the petitioner filed his second petition for a writ of habeas corpus. He alleged that his previous habeas counsel, Vogt, failed to address issues concerning (1) the suppression of exculpatory evidence, (2) the ineffective assistance of his trial counsel and (3) the effect of newly discovered evidence relating to Dandy-Walker Syndrome.[4] *Lapointe* v. *Commissioner of Correction,* 113 Conn. App. 378, 387, 404, 966 A.2d 780 (2009). After the close of the petitioner's case, the respondent commissioner of correction moved for a judgment of dismissal for failure to establish the prima facie elements of the petitioner's claims pursuant to Practice Book § 15-8. The court, *Fuger, J.,* granted the motion as to all three counts, and the petitioner appealed from that judgment to this court. Id. We affirmed in part and reversed in part the judgment of dismissal. Specifically, we reversed the judgment on count one as it related to a potentially exculpatory expert opinion contained in a note written by Detective Michael Ludlow (Ludlow note) regarding the burn time of the fire set at the victim's apartment; id., 396–97, 404; and we further reversed the court's judgment on those portions of count two concerning trial counsel's failure to utilize evidence to prove the factual unreliability of the petitioner's inculpatory statements to the police. The case was remanded to the habeas court for further proceedings. Id., 404.

---

[4] The petitioner has been diagnosed with Dandy-Walker Syndrome.

On remand, Judge Fuger declared a mistrial as to the issues remanded by this court and disqualified himself from any further proceedings in the petitioner's matter. The case then was assigned to the present habeas court (second habeas court), *Nazzaro, J.,* to adjudicate the remanded claims. With permission of the second habeas court, the petitioner was allowed to amend his second petition for a writ of habeas corpus to include a claim of actual innocence based on newly discovered DNA evidence.[5] The operative three count complaint set forth the following three claims: (1) Vogt provided ineffective assistance as first habeas counsel by failing to raise as an issue the state's suppression of its arson expert's opinion that the burn time of the fire set in the victim's apartment was between "30–40 mins. Poss."; (2) Vogt provided ineffective assistance as habeas counsel by failing to prove that Culligan and Cosgrove, the petitioner's trial counsel, provided ineffective assistance as trial counsel by failing to utilize available evidence to demonstrate the factual unreliability of the petitioner's inculpatory statements to the police; and (3) the petitioner was actually innocent of the crimes for which he was convicted as evidenced by DNA testing on gloves and a pubic hair collected at the crime scene.

During the nine day trial, the second habeas court heard testimony from eighteen witnesses, including Vogt, Culligan, Cosgrove, Morrissey and Ludlow. Stephen Igoe, the state's fire expert who had testified at the criminal trial,[6] also testified at the second habeas proceeding. The petitioner claimed that the information in the Ludlow note regarding the burn time came from Igoe. Other witnesses at the second habeas proceeding

---

[5] The second habeas court also permitted the petitioner to amend his petition further to incorporate additional evidence in support of his actual innocence claim. The second amended petition filed on March 5, 2010, is the operative complaint.

[6] At the criminal trial, Igoe testified as an expert in the field of fire investigation and the determination of the cause and origin of fires.

included fire investigators and arson experts, who specialized in the reconstruction of fires and explosions, a criminalist, various experts in DNA analysis and Karen Martin. More than 200 exhibits were admitted as full exhibits, including transcripts from the trial and first habeas proceeding, police reports, and statements from witnesses obtained during the homicide investigation. The parties filed simultaneous posttrial and reply briefs.

The second habeas court issued its memorandum of decision on April 15, 2011. After summarizing the testimony of the witnesses for the petitioner and the respondent, the court rejected the petitioner's actual innocence claim. Although the court found that the petitioner had presented newly discovered evidence with respect to DNA analysis, it concluded that the results were unreliable, particularly as to the pair of gloves, because of contaminated or potentially contaminated DNA samples. With respect to the pubic hair, the court stated that it could not be determined with any degree of certainty how the hair came to rest on the blue sweater. Although the DNA analysis excluded the petitioner as a donor, the court reasoned that the hair could have come from the perpetrator or it could have been transferred to the crime scene in a manner unassociated with the attack on the victim.

The second habeas court also rejected the petitioner's claims of ineffective assistance of habeas and trial counsel. The court, bound by the conclusion of this court in *Lapointe* v. *Commissioner of Correction*, supra, 113 Conn. App. 390–92, treated the Ludlow note as potentially exculpatory and assumed that Vogt's performance was defective for failing to pursue that issue as a claim in the first habeas proceeding. The court determined, however, after evaluating the testimony of the forensic scientists on burn time, that the respondent's expert was "more persuasive" in this "contest among experts." The court also noted that the experts were unable to

determine the precise time that the fire had been set. Accordingly, the court concluded that the evidence regarding burn time was not material and that the petitioner failed to prove that he was prejudiced by Vogt's deficient performance with respect to the suppressed Ludlow note.

Finally, the second habeas court found that the petitioner failed to prove that habeas and trial counsel were ineffective for failing to utilize the evidence admitted at trial to demonstrate the unreliability of the petitioner's inculpatory statements to the police. The court agreed with the respondent's argument that the gravamen of the petitioner's claim was that trial counsel should have done more to emphasize or to highlight the state's evidence that was inconsistent with the petitioner's statements. It was the court's conclusion that the evidence itself made the discrepancies readily discernable: "The discrepancies between the petitioner's statements and evidence in the victim's apartment necessitated little additional emphasis from trial counsel, and the court is very hard pressed to somehow fault Attorney Vogt's decision not to dwell on such a claim." Accordingly, the second habeas court denied the petitioner's second petition for a writ of habeas corpus. This appeal followed.

I

We first address the petitioner's claim that the second habeas court improperly rejected his actual innocence claim. In the third count of his second amended petition for a writ of habeas corpus, the petitioner alleged actual innocence due to new DNA testing conducted on a pair of men's gloves and a pubic hair recovered from the crime scene. He claims that the testing results excluded him as the perpetrator of the crimes for which he was convicted. Specifically, the petitioner argues that because mitochondrial DNA evidence established that

the pubic hair found on the victim's blue sweater was neither the victim's nor the petitioner's pubic hair, it "defies logic" that a pubic hair of unknown origin could have been deposited innocently at the crime scene. With respect to the DNA testing on the gloves, the petitioner argues that the court improperly concluded that the method of testing was not widely accepted in the forensic community and not accepted in postconviction criminal matters.

The following additional facts are relevant to the petitioner's claim. The pubic hair retrieved from the victim's blue sweater, which was located on the floor near the bed at the crime scene, was subjected to mitochondrial DNA testing. The DNA analysis of the pubic hair excluded the victim and the petitioner as the donor. The second habeas court credited the testimony of the experts with respect to that conclusion.

With respect to the testing of the gloves, Jody Hynds, a forensic DNA consultant, testified how she collected the samples. She stated that she turned each glove inside out and used a scalpel blade to scrape material for DNA analysis. Using a postamplification cleanup procedure, with the low quantity of available DNA, Hynds concluded that the petitioner was not a contributor to the DNA retrieved from either the right or left glove. The testing of the sample from each glove revealed a partial mixed DNA profile, which indicated that more than one individual contributed to the extracted scrapings. Hynds testified that contamination is an important concern when utilizing such a procedure and that the results from the testing would not indicate how old the DNA was or when it had been deposited on the gloves. She also testified that it is possible for an individual to transfer his or her DNA to a glove simply by putting the glove on one's hand.

One of the respondent's witnesses, a court officer for criminal matters at the Superior Court for the judicial

district of Hartford, testified that members of the public are permitted to handle evidence that has been admitted at a criminal trial, after the clerk's office first segregates any evidence sealed by statute or court order. Plastic or latex gloves are available for anyone handling the evidence who chooses to use them. She testified that evidence from the petitioner's criminal case had been stored at the courthouse and had been available for examination by the public. Another witness for the respondent, a reporter for a local Manchester newspaper, testified that in 1994, he viewed the evidence from the petitioner's criminal case at the clerk's office and slipped the evidence gloves on his own hands without using latex gloves.

Carll Ladd, the supervisor of the DNA section of the state forensic laboratory, testified that he did not consider the use of post-amplification cleanup procedures to be suitable for forensic applications because of concerns relating to the relevance and reliability of such methods. Ladd also stated that such procedures increase the risk of contamination. He particularly was concerned about the results from the gloves in the present case because they had been handled without precautions such as latex gloves and particle masks. According to Ladd, placing one's hands in the gloves could add to the DNA profile or mask whatever had been there in the first place, thereby making the findings invalid.

Given this background, we now set forth the standard for review in determining whether this habeas petitioner has met the standard of proof with respect to his actual innocence claim. "In consideration of a proper balance of the interests at stake in the evaluation of a freestanding claim of actual innocence, of the well established jurisprudence regarding the functions of an appropriate burden of proof for a particular category of case, and of the remedy that would follow from a

determination in a habeas proceeding of actual innocence, we conclude that the most appropriate standard of proof is as follows. First, taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the context of such a claim, that the petitioner is actually innocent of the crime of which he stands convicted. Second, the petitioner must establish that, after considering all of that evidence and the inferences drawn therefrom, as the habeas court did, no reasonable fact finder would find the petitioner guilty." *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 791–92, 700 A.2d 1108 (1997). "Our use of the term 'actual innocence' is of paramount significance. Actual innocence, also referred to as factual innocence . . . is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime." (Citations omitted.) *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 560–61, 22 A.3d 1196 (2011).

In the present case, the second habeas court concluded that the petitioner failed to meet his burden of proof because none of the DNA evidence rose to the level of being clear and convincing evidence of factual innocence. Although the pubic hair was on the victim's sweater and the DNA analysis excluded the petitioner as its donor, the evidence did not clearly and convincingly demonstrate that its donor was the perpetrator. As stated by the court, it is possible that the transfer of the pubic hair occurred in some manner unassociated with the attack on the victim. With respect to the gloves, the court heard testimony as to the unreliability of the

results of postamplification cleanup procedures. The DNA testing did not exonerate the petitioner, particularly given the fact of contamination or potential contamination by at least one individual who put the gloves on his own hands without the protection of latex gloves. The court summarized its reasoning as follows: "[T]he fact that no direct link via DNA can be established between the petitioner and the gloves does not prove that the petitioner did not commit the assault and murder."

We agree that the absence of DNA or other evidence connecting the petitioner to the pubic hair and gloves does not amount to proof of actual or factual innocence under the circumstances of this case. The petitioner's claim on appeal that the second habeas court improperly rejected his actual innocence claim fails under the standard set forth in *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 559–61.

II

We next address the petitioner's claim that the second habeas court improperly determined that prior habeas counsel did not provide ineffective assistance by failing to pursue the claim that the state's suppression of exculpatory material, the Ludlow note, deprived him of a fair trial. The court rejected that claim, concluding that the burn time referenced in the Ludlow note was not material and that the petitioner was not prejudiced by Vogt's deficient performance because none of the experts could determine the precise time that the fire was set.

The following additional facts are necessary for the proper resolution of this claim. At the time of the victim's homicide, Ludlow was a detective with the Manchester police department and was assigned as the evidence officer for the crime scene. He subsequently assumed the position of case officer, which meant that

he was responsible for the entire criminal investigation.[7] A few days after the homicide, Ludlow had conversations with two state fire marshals who were assisting with the investigation. Ludlow took notes and wrote "CSP," which stood for Connecticut State Police, and "Steve Igoe" and "Joe Roy," the names of the state fire marshals. Underneath those notations on the Ludlow note, the words: "30–40 mins. Poss." were written. The numbers "30" and "40" were underscored twice. Ludlow testified that the notation "[p]oss." meant "possible" and that the times represented the minimum amount of time that the fire could have been burning before the first responding firefighters arrived at the victim's apartment. At the time of the second habeas trial, Ludlow stated that he could not remember who gave him the burn time information. He admitted, however, that he was not an expert on fires and that he would not have made that estimate on his own. He testified that he would have asked one of the experts for the burn time if he was trying to determine a window of time within which the fire could have been started. Ludlow also acknowledged that at the time of the first habeas proceeding, he testified that he had obtained the information as to a possible burn time from either Igoe or Roy.[8]

The Ludlow note was first disclosed to defense counsel in 1999, after the petition for habeas corpus had been filed in the first habeas action. Culligan and Cosgrove both testified that they had not seen the Ludlow note prior to the petitioner's criminal trial in 1992.[9] Vogt,

---

[7] He remained the lead investigator until he was replaced in March, 1989, by Lombardo.

[8] Roy testified that he was Igoe's assistant in the investigation. He further testified that he had not offered an estimate with respect to the burn time of the fire.

[9] Culligan stated that the first time he saw the Ludlow note was at the first habeas trial, which took place over several days in February, March and April, 2000.

after receiving the Ludlow note and other materials, amended the petition to allege the state's failure to disclose or to produce the Ludlow note as *Brady*[10] material, as required by the constitutions of the United States and Connecticut. He did not, however, pursue that issue during the first habeas trial. The first habeas court, in its memorandum of decision, did not address the claim regarding the Ludlow note because it deemed that claim to have been abandoned.

Vogt's failure to pursue the claim that the state suppressed the Ludlow note was alleged to be ineffective assistance of counsel in the second habeas proceeding. During the second habeas trial, Vogt testified that he had not pursued that claim because he did not believe the notation as to burn time in the Ludlow note to be exculpatory.[11] Culligan[12] and Cosgrove, in their testimony before the second habeas court, opined that the Ludlow note was exculpatory[13] and that the information could have been used by defense counsel at the criminal

---

[10] See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material." *State* v. *Esposito*, 235 Conn. 802, 813, 670 A.2d 301 (1996).

[11] Vogt testified that he had never tried a habeas case prior to representing the petitioner in the first habeas proceeding involving a capital felony conviction. He also acknowledged that he had no jury trial experience in criminal cases as a trial attorney. Prior to his representation of the petitioner, Vogt testified that his experience consisted of participation in commercial litigation in a supporting capacity.

[12] Culligan testified at the second habeas proceeding that he is a career public defender employed by the state. He stated that he has been assigned to the unit that represents the accused in capital felony death penalty prosecutions since August, 1988. Culligan was lead counsel and Cosgrove assisted him at the petitioner's criminal trial.

[13] "Exculpatory has been defined to mean [c]learing or tending to clear from alleged fault or guilt; excusing." (Internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, supra, 113 Conn. App. 390. "Evidence that tends to prove [the petitioner's] temporal inability to have committed the crime satisfies the definition of exculpatory . . . ." Id., 392.

trial to buttress the petitioner's alibi defense. Culligan and Cosgrove further testified that if the Ludlow note had been disclosed to defense counsel prior to the jury trial, their strategy would have changed.

Karen Martin was not called as a witness in the petitioner's criminal trial. Culligan stated that Karen Martin and the petitioner were divorced by that time and that the working relationship between her and the defense was no longer a good one. Although he discovered prior to trial that Morrissey had interviewed her on July 4, 1989, and that she had expressed her support for the petitioner at that time, and although he knew that she had testified at the suppression hearing that the only time the petitioner was out of her sight on the night of the homicide was when she bathed their son between 6:15 p.m. and 7 p.m., Culligan decided not to compel her testimony. He testified that he was concerned about her attitude toward the petitioner. Further, he was unaware of the existence of the Ludlow note and the importance of the start time of the fire to support the petitioner's alibi defense. Culligan testified that if he had known that Igoe, the state's fire expert, gave a burn time of thirty to forty minutes, he would have called Karen Martin as a witness because her testimony would have established that the petitioner was home when the fire was set.[14] He also acknowledged that he would have hired an arson expert had he known of the information in the Ludlow note.

Similarly, Cosgrove testified that the defense did not call Karen Martin as a witness because they considered her to be a hostile witness by the time of trial. He, too,

[14] Culligan's testimony was as follows: "I mean at that point it wouldn't have made any difference whatever her allegiance to [the petitioner] was at the—when we did the trial because this thirty to forty minute burn time would mean that he'd have to have been home as she had consistently testified during the time—seven to eight o'clock, when they were watching television with [their son]."

testified that he would have changed his assessment of the necessity of her testimony if he had known of the burn time referenced in the Ludlow note: "[I]t would have supported the alibi that [her] initial story had given."[15] Cosgrove stated that he believed the Ludlow note was exculpatory because a time frame for the commission of the crimes would have been established by the burn time, and the petitioner was not temporally available during that window of time.

The second habeas court, although ruling that the Ludlow note potentially was exculpatory and assuming that it had been "inadvertently 'suppressed' " by the state,[16] concluded that the information with respect to burn time was not material and that the petitioner was not prejudiced by Vogt's failure to pursue the claim at the first habeas proceeding. The court came to that conclusion after weighing the "[c]onsiderable and extensive testimony by arson experts/investigators" that had been presented by the petitioner and the respondent with respect to burn time. The court summarized the testimony of five witnesses, including Igoe and Roy. The petitioner's arson experts were Gerald

---

[15] The following questioning occurred:

"[Habeas Counsel]: "And wouldn't it have made it impossible for [the petitioner] to have set the fire. Correct?

"[Cosgrove]: Right.

"[Habeas Counsel]: [Be]cause it was undisputed that he was home from, under any version from seven o'clock till the time he got the phone call to walk over there. Correct?

"[Cosgrove]: Yes."

[16] On appeal, the respondent argues that the Ludlow note was not suppressed because it was preliminary and speculative and the petitioner's trial counsel knew of its essential facts. The second habeas court did not address those claims. In its memorandum of decision, the court stated: "There is no indication or evidence that the Ludlow note was wilfully suppressed, so this court will assume, without deciding, solely for purposes of further addressing the petitioner's claim, that the Ludlow note was inadvertently suppressed." (Internal quotation marks omitted.) Without any further analysis by the court, the record is inadequate for us to address this argument of the respondent.

Kelder, Jr., and John DeHaan. The respondent's arson expert was Robert Corry.

The court's summary included the following descriptions. Kelder, "a highly experienced fire investigator," opined that the fire burned from forty-five minutes up to one hour. His estimated burn time placed the start of the fire at approximately 7:30 p.m., which, as the second habeas court noted, would have supported the petitioner's alibi defense. DeHaan, a criminalist and forensic scientist specializing in fire and explosion reconstruction, "presented extremely thorough testimony about the numerous variables that impact a fire, even in an apartment as small and contained as the victim's." According to DeHaan, approximately twenty-five to sixty minutes elapsed from the time of ignition to the time that the fire was discovered or extinguished. Again, as noted by the court, DeHaan's opinion would have supported the petitioner's alibi defense. Corry, the respondent's expert, was "a highly experienced fire and explosion investigator, [and] also presented extremely detailed testimony about the fire and its dynamics." In Corry's opinion, the fire could have been set any time between 5:45 p.m. and 7:55 p.m. His estimate did not support the petitioner's alibi defense.

The second habeas court, in reaching its determination on materiality and prejudice, stated: "The evidence presented to this court in the form of expert testimony amounts to a contest among experts conducted many years after fact witnesses testified, and were subject to rigorous cross-examination, before the jury. The court, as the finder of fact in this proceeding, assigns far more credit or weight to the testimony of Robert Corry rather than Gerard Kelder or [John] DeHaan regarding estimation of the burn time. The petitioner, thusly, has failed to establish prejudice with respect to any claim vis-a-vis *Brady*." The court further stated that because the

precise time that the fire was set could not be determined, and Corry's estimate placed the ignition time in a range between 5:45 p.m. and 7:55 p.m., Karen Martin's testimony that the petitioner was out of her sight between 6:15 p.m. and 7 p.m. would not have been helpful to establish his whereabouts at the time the crimes had been committed.

With those additional facts in mind, we set forth the applicable standard of review for analyzing an ineffective assistance of habeas counsel claim for failure to pursue the state's suppression of *Brady* material. We begin with the familiar two part test enunciated by the United States Supreme Court in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "In *Strickland,* which applies to claims of ineffective assistance during criminal proceedings generally, the United States Supreme Court determined that the claim must be supported by evidence establishing that (1) counsel's representation fell below an objective standard of reasonableness, *and* (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. . . . The first prong is satisfied by proving that counsel made errors so serious that he was not functioning as the counsel guaranteed by the sixth amendment. The second prong is satisfied if it is demonstrated that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction,* supra, 113 Conn. App. 393–94.

"[When] applied to a claim of ineffective assistance of prior habeas counsel, the *Strickland* standard requires the petitioner to demonstrate that his prior habeas counsel's performance was ineffective and that

this ineffectiveness prejudiced the petitioner's prior habeas proceeding. . . . [T]he petitioner will have to prove that one or both of the prior habeas counsel, in presenting his claims, was ineffective and that effective representation by habeas counsel establishes a reasonable probability that the habeas court would have found that he was entitled to reversal of the conviction and a new trial . . . ." (Internal quotation marks omitted.) Id., 394.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unworkable. . . . Only if the petitioner succeeds in [this] herculean task will he receive a new trial. This new trial would go to the heart of the underlying conviction to no lesser extent than if it were a challenge predicated on ineffective assistance of trial or appellate counsel." (Internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, 126 Conn. App. 453, 457–58, 11 A.3d 730, cert. denied, 300 Conn. 932, 17 A.3d 69 (2011).

Because the petitioner's claim of ineffective assistance involves the failure to pursue the state's suppression of *Brady* material, we also look to the standard required to establish a *Brady* violation. "[A] trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error." *State* v. *Ortiz*, 280 Conn. 686, 720, 911 A.2d 1055 (2006). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in

its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Citation omitted; internal quotation marks omitted.) Id., 718. To satisfy the third prong of *Brady*, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Gibson* v. *Commissioner of Correction*, 135 Conn. App. 139, 149, 41 A.3d 700, cert. denied, 305 Conn. 922, 47 A.3d 881 (2012).

We conclude that the state's suppression of the Ludlow note, and Vogt's failure to pursue that claim, warrants a new trial for the petitioner. We reach that conclusion for the following reasons. Culligan and Cosgrove testified that had the burn time information in the Ludlow note been disclosed prior to the petitioner's criminal trial, their trial strategy would have changed. They stated that they would have used the thirty to forty minute estimate to buttress the petitioner's alibi defense, particularly because the estimate came from one of the state's fire marshals assigned to the investigation. As Culligan testified, the defense would have retained the services of an arson expert. At the second habeas trial, the two experts called by the petitioner testified that the fire could not have been set any earlier than 7:30 p.m.[17] If that testimony had been presented

[17] We note that the respondent's expert testified that the fire could have been set as early as 5:45 p.m. The second habeas court found his testimony more persuasive than the testimony of the petitioner's experts. The petitioner exercised his sixth amendment right to a trial by an impartial jury. If the Ludlow note had been disclosed to trial counsel, however, it would have been the responsibility of the jury and not the court to weigh the credibility

at the criminal trial, and credited by the jury, the petitioner's whereabouts at and after 7:30 p.m. would have been critical to his defense.

For that reason, as both trial counsel testified, they would have called Karen Martin as a witness at the criminal trial. She consistently had maintained that the petitioner was in their home with her and their son the entire evening of the victim's homicide.[18] During her testimony at the suppression hearing, she stated that the only time that the petitioner was not in her sight was between 6:15 p.m. and 7 p.m., when she was bathing their son. If the jury credited Karen Martin's testimony, it could have concluded that the petitioner was at home watching television with her and their son when the fire had been set.

Further, if Karen Martin had testified and the jury believed her testimony, the jury could have concluded that the petitioner had, at most, a forty-five minute window of time within which to commit the crimes. This would mean that between 6:15 p.m. and 7 p.m., on the night of the homicide, the petitioner: (1) walked the distance between his home and the victim's apartment;[19] (2) had a cup of coffee with the victim while they were chatting on the couch; (3) used the victim's bathroom, located close to the victim's bedroom; (4)

---

of the arson experts. Whether the burn time evidence, which was so critical in buttressing his alibi defense, raised a reasonable doubt as to the petitioner's guilt would best be a determination left to the jury and not a habeas court.

[18] She testified at a pretrial suppression hearing that the petitioner took the dog for a twenty minute walk shortly after they had returned from their visit with the victim. According to her testimony, they had dinner at approximately 5:30 p.m., after the petitioner had returned from walking the dog. As previously noted, the victim was seen alive by her daughter at approximately 5:45 p.m. that evening.

[19] The record contains testimony that it took the petitioner approximately ten to fifteen minutes to walk from his home to the victim's apartment. There also is testimony that because the petitioner has Dandy-Walker Syndrome, he is slow and unsteady on his feet.

emerged from the bathroom, saw the victim combing her hair and decided to sexually assault her; (5) undressed himself, then tore the clothes off the victim; (6) sexually assaulted the victim; (7) retrieved a knife from the kitchen; (8) stabbed the victim ten times in the back and once in the abdomen; (9) used strips of cloth to tie them as a ligature so tightly around the victim's neck that the responding firefighters had difficulty removing the cloth; (10) loosely tied bindings around the victim's wrists and stomach area; (11) removed the victim from the bed and placed her on or near the couch;[20] (12) washed any blood from his body and dressed himself; (13) set fires in three separate locations in the victim's apartment; and (14) walked the distance from the victim's apartment back to his home.[21] According to Karen Martin's recorded statements to Morrissey on July 4, 1989, and her testimony at the suppression hearing, which the jury did not hear, the petitioner was sitting in the living room when she came downstairs from bathing their son, and there were no signs of exertion or excitement. She noticed nothing out of the ordinary in his behavior that evening.

We cannot say that the petitioner is factually innocent and did not commit the crimes for which he was convicted. However, we do conclude that there is a reasonable probability that the result of his criminal trial would have been different had the Ludlow note been disclosed to Culligan and Cosgrove prior to trial. Nondisclosure prior to trial of the portion of the Ludlow note describing the possible burn time affected the overall fairness of the trial and was so unfair as to undermine our

---

[20] There was testimony during the criminal trial that the petitioner, when employed at a local grocery store, could lift bags of groceries weighing up to twenty pounds but struggled with objects weighing from fifty to seventy pounds.

[21] This scenario is comprised from the petitioner's statements to the police, which the jury believed in order to find him guilty of all of the charged crimes, and the actual evidence submitted at trial.

confidence in the jury's verdict. With the burn time estimate provided by one of the state's fire marshals, trial counsel testified that they would have retained the services of an arson expert and that Karen Martin would have testified as to the petitioner's whereabouts during the critical times of that evening. That evidence, if believed by the jury, could have resulted in the jury's finding that it was temporally impossible for the petitioner to have committed the crimes for which he was convicted. The Ludlow note was exculpatory and material in these circumstances. Vogt's performance was deficient when he failed to pursue that issue at the first habeas proceeding, and the petitioner was prejudiced by his failure to do so.[22] The petitioner has demonstrated

---

[22] Because we conclude that the petitioner is entitled to a new trial for the reasons discussed herein, we need not address the petitioner's additional claim that Vogt rendered ineffective assistance of counsel by failing to establish that trial counsel did not utilize available evidence to prove the factual unreliability of the petitioner's inculpatory statements to the police.

During the first habeas proceeding, Vogt claimed that Culligan and Cosgrove rendered ineffective assistance of counsel by failing to argue that certain items admitted into evidence demonstrated reasonable doubt as to the petitioner's guilt. Two men's gloves found at the crime scene, one on the bed and the other by the side of the bed, were never connected to the petitioner. Nevertheless, trial counsel never questioned the petitioner, who testified at the criminal trial, or any of the state's witnesses, about the ownership of those gloves. Further, Vogt claimed that trial counsel should have stressed that certain hairs of unknown origin were found at the crime scene and demonstrated reasonable doubt as to the petitioner's guilt. Vogt failed to prevail on those claims, however, because the first habeas court stated that he had failed to ask Culligan at the first habeas proceeding why the defense did not mention the gloves or the hairs. The first habeas court, in refusing to speculate as to the reasons for the failure to argue those matters to the jury, concluded that Vogt had failed to sustain his burden to show that Culligan's actions were not strategic in nature.

In the second habeas petition, the petitioner claimed that Vogt rendered ineffective assistance by failing to question trial counsel with respect to their failure to utilize the gloves, a pubic hair of unknown origin and various other evidence admitted at trial to prove the factual unreliability of the petitioner's inculpatory statements to the police. Specifically, it is claimed that habeas and trial counsel rendered ineffective assistance because the following inconsistencies were not emphasized: (1) the petitioner did not mention the men's gloves in any of his statements to the police, and owner-

that had there been effective representation by Vogt, there is a reasonable probability that the first habeas court would have found that the petitioner was entitled to reversal of the conviction and a new trial. See *Gibson* v. *Commissioner of Correction*, supra, 135 Conn. App. 156.

The judgment denying the second amended habeas petition is reversed with respect to count one of the petition alleging ineffective assistance of counsel pertaining to the *Brady* violation claim and the case is remanded to the habeas court with direction to render judgment granting the writ of habeas corpus as to that count and to order a new trial for the petitioner. The judgment is affirmed with respect to count three of the petition alleging actual innocence. The appeal is dismissed with respect to count two of the petition alleging ineffective assistance of counsel pertaining to the petitioner's inculpatory statements as this court declined to address that claim.

In this opinion the other judges concurred.

ship of those gloves never was established; (2) a pubic hair dissimilar to samples taken from the victim and the petitioner was found on the victim's blue sweater at the side of the bed; (3) the petitioner said that he stabbed the victim on the couch, but the evidence showed that she was stabbed on the bed; (4) the petitioner never mentioned the ten stab wounds to the victim's back; (5) the petitioner said that the victim was wearing a pink housecoat when the physical evidence demonstrated that she had been wearing a blouse, slacks and blue sweater when she was attacked; (6) the petitioner indicated by hand gestures that he strangled the victim manually when the medical examiner testified that she was asphyxiated by pressure to the right side of her neck with a blunt object; and (7) the petitioner did not mention the fact that strips of cloth were tied around the victim's neck, wrists and abdominal area.

When Culligan and Cosgrove were asked at the second habeas proceeding why they failed to point out these discrepancies to the jury, they could not provide explanations for their failure. Culligan always has maintained that he and Cosgrove, early in the case, believed that the petitioner was actually innocent and that they would have to convince a jury that his confessions were coerced and false. It is difficult to discern why such discrepancies would not have been emphasized to the jury during the trial when the stated trial strategy was to demonstrate the falsity of the petitioner's statements.