******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. I join Justice Zarella's thorough and well reasoned dissent, which explains why the applicable standard of review and governing principles of law require this court to reverse the judgment of the Appellate Court, which improperly concluded that the petitioner, Richard Lapointe, is entitled to a new trial. There is no need for me to duplicate his compelling analysis. I write separately to emphasize what I view to be the central and troubling flaw in the majority opinion—it constitutes unfettered judicial activism and reflects a complete misunderstanding of the proper role that this court should play within the rule of law. With no reservations whatsoever, the majority usurps the fact-finding role of the trial court in defiance of the constitutional limits on this court's jurisdiction, ignores this court's own recently established guidelines that were intended to mitigate the damage to our system of justice and the prejudice to the parties when this court raises claims sua sponte on appeal, and blatantly serves as an advocate for the petitioner, Richard Lapointe. In other words, in a gross parody of judicial economy, the majority functions as fact finder, counsel *and* reviewing court. And the majority accomplishes all of this apparently with good intent and in the name of justice.

John Rawls explained the relationship between the rule of law, justice and the legal system: "[T]he conception of formal justice, the regular and impartial administration of public rules, becomes the rule of law when applied to the legal system." J. Rawls, A Theory of Justice (1971) § 38, p. 235. Within the legal system, therefore, the rule of law *is* justice. One of the greatest dangers to a just society is presented when one in power acts outside the rule of law in order to vindicate a personal view of what justice requires. Such action should be exceedingly rare, and undertaken only when compelled by necessity. Significantly, immediately after defining the interrelationship between these foundational components of a just society, Rawls provided an example of injustice to illustrate that even seemingly innocuous, well-intentioned departures from impartiality and regularity pose a danger to the rule of law: "One kind of unjust action is the failure of judges and others in authority to apply the appropriate rule or to interpret it correctly. It is more illuminating in this connection to think not of gross violations exemplified by bribery and corruption, or the abuse of the legal system to punish political enemies, but rather of the subtle distortions of prejudice and bias as these effectively discriminate against certain groups in the judicial process." Id.

Justice is not achieved by suspending the rules in order to benefit a single individual through a judicial

decision. Justice is not served when a reviewing court expands its role to include fact-finding, a role properly and constitutionally reserved to the trial court. And justice is most certainly *not* attained by doffing one's judicial robe and donning an advocate's suit. That, however, is precisely what the majority has accomplished through today's decision. By resolving the appeal on a basis not argued by either of the parties—indeed, on an issue that, as Justice Zarella points out, was expressly *abandoned* by the petitioner—without allowing them the opportunity to brief the issue, the court flouts the principle that legal rules should be applied in a regular manner. By refusing to defer to the habeas court's predicate credibility findings and its ultimate factual finding that the burn time of the fire could not be determined, the majority acts without jurisdiction and in defiance of this court's constitutional role within the judicial system. By advocating on behalf of the petitioner, the majority appears to abandon any pretense of impartiality. The rule of law has been damaged by today's decision, which casts a cloud over the court, and it is reasonable to wonder if that cloud portends an approaching storm.

Unfortunately, there is nothing in the majority's departure from the rule of law that is even remotely innocuous. As Justice Zarella's dissenting opinion demonstrates in detail, the majority resolves this appeal on a basis not argued by the petitioner, either at the Appellate Court or this court, without allowing the parties the opportunity to brief the issue. The majority itself summarizes the claim raised by the petitioner to the Appellate Court, namely, that "the state's failure to disclose the Ludlow note[1] deprived him of due process of law and that his first habeas counsel had rendered ineffective assistance under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), for failing to pursue and prove that claim." (Footnotes altered.) The majority concedes that at the habeas court "the sole issue with respect to the Ludlow note was whether it was material." The majority further acknowledges that this court has expressly stated that the applicable standard of review is that "a trial court's determination as to materiality under [*Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 720, 911 A.2d 1055 (2006). The majority then blithely applies plenary review to the entire materiality determination, including the habeas court's factual findings.

As Justice Zarella points out in his dissent, neither of the parties has raised the issue on which the majority resolves this appeal. Certainly, the respondent, the Commissioner of Correction, does not ask this court to reconsider a well established standard of review that

in this instance favors the state. Justice Zarella aptly contrasts the respondent's brief in the present case with the brief of the respondent in *Anderson* v. *Commissioner of Correction*, 313 Conn. 360, 375, 98 A.3d 23 (2014), cert. denied sub nom. *Anderson* v. *Semple*, U.S.   (83 U.S.L.W. 3678 February 23, 2015), in which the state was on notice that this court would be reviewing the question of whether an appellate tribunal properly may revisit the factual findings of the habeas court, because in that case a dissenting judge at the Appellate Court had done precisely that. Accordingly, in the respondent's certified appeal to this court in *Anderson*, Justice Zarella notes that the respondent fully briefed the issue of the appropriate standard of review. Justice Zarella's implied question to the majority, therefore, is crucial—if the respondent is on notice, as the majority purports, that this court will reconsider the appropriate standard of review, why did the respondent fail to brief the issue?

As to the petitioner, not only has he failed to challenge the factual findings of the habeas court, he has expressly abandoned any claim that those findings constituted clear error by stating that he agrees with the habeas court's ultimate factual findings that "the experts could not determine the exact amount of time the fire burned" and that "the fire's burn time could not be precisely determined." Additionally, the petitioner has not argued that this court should adopt a de novo standard of review of a habeas court's factual findings and, indeed, the petitioner could not prevail in such an argument. As Justice Zarella explains cogently and thoroughly in his dissenting opinion, it is beyond this court's jurisdiction to review factual findings de novo, and it is beyond this court's power to allow to itself what our constitution forbids.

Given the petitioner's acquiescence to the factual findings of the habeas court, one would expect the majority to take those findings as the starting point for its consideration of whether the court properly concluded that the Ludlow note was not material. The habeas court's factual findings, however, are problematic for the majority, because those findings do not favor the petitioner. The habeas court stated that "as the finder of fact" it assigned "far more credit" to the respondent's expert, Robert Corry, than it did to the petitioner's experts, Gerard Kelder, Jr., and John DeHaan. Predicated on that subordinate factual finding, the court ultimately found that "the precise time the fire was set *cannot* be determined." (Emphasis added.) The court grounded its legal conclusion that the Ludlow note was not material on its ultimate factual finding that the evidence did not establish that the burn time could be determined with sufficient precision to support the petitioner's proposed alibi defense. Finally, as to the petitioner's proposed alibi defense, the court also found that the petitioner's only alibi witness, his former

wife, Karen Martin, without whose testimony the Ludlow note and the testimony of the burn time experts would be irrelevant to the petitioner's *Brady* claim, lacked credibility.

One might well ask why these findings are problematic for the majority. The answer is quite simple—the majority apparently takes as its starting point the conclusion that the petitioner is innocent.[2] It is not necessary to engage in any "divination" to discern the impetus driving the majority's decision. My conclusion that the majority begins with the conviction that the petitioner is innocent, and only constructs its analysis after it has arrived at that conclusion, is grounded on three observations. First, as I explain in this dissenting opinion, the majority has not grounded its conclusion on any valid legal principle. If the majority's conclusion is not compelled by the law, and is in fact prohibited by it, it is reasonable to question what *has* led the majority to arrive at its conclusion. Second, the tinted lens through which the majority views the petitioner's case suggests an answer to that question—that is, the biased language that the majority uses to describe the petitioner's case supports the conclusion that the majority is not viewing the case objectively. Finally, the majority attempts to confine its new rule to the facts of the present case, thus indicating that it has crafted this new rule *specifically* for this petitioner. For example, the majority emphasizes that the case "presents a highly unusual scenario . . . ." Most tellingly, in response to Justice Zarella's justified concerns regarding the subsequent application of the majority's new rule, the majority states that its reliance on *Bunch* v. *State*, 964 N.E.2d 274, 293 (Ind. App. 2012), is justified because that case is "factually and procedurally indistinguishable in any material respect from this one."

The findings of the habeas court are irreconcilable with the majority's apparent conviction that the petitioner is innocent, and, if left standing, those findings would compel the conclusion that the habeas court properly concluded that the Ludlow note was not material. There are occasions when the factual findings of the trial court are determinative—this is one of those occasions. Because the majority is unwilling to acknowledge this limitation on its power, the majority's task is clear—somehow, some way, those findings must fall.

The factual findings of the habeas court create both procedural and substantive hurdles for the majority. First, as a procedural matter, because the parties have not been notified that the appeal will be resolved on a claim raised sua sponte by this court—resolving the appeal by revisiting the factual findings pursuant to a radical new standard of review—the parties must be allowed to submit supplemental briefs. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Con-*

*necticut, Inc.*, 311 Conn. 123, 161–62, 84 A.3d 840 (2014) (*Blumberg*). Second, as a substantive matter, and as Justice Zarella explains, because this court lacks jurisdiction to render judgment on the facts of a case, as a matter of law, the majority cannot revisit the factual findings. Undaunted, the majority nevertheless sets to its task, first making quick work of the habeas court's ultimate factual finding that the burn time of the fire could not be determined with any precision, and the court's finding that Martin lacked credibility, by simply ignoring those findings. This solution is both elegant and ingenious—if a finding is problematic, simply pretend it is not there.

Because the majority cannot claim that the habeas court made *no* factual findings, it is forced to acknowledge that the court did indeed make credibility "findings." Not to worry—confident that it is up to the task, the majority dusts off its hands and sets to the messy work of dismantling the habeas court's credibility findings, which it recasts as findings of persuasiveness, rather than credibility. The majority appears to believe that by substituting the word "persuasive" for "credible" it has cleverly recast the habeas court's credibility findings as somehow not *really* credibility findings. The majority also suggests that determinations of expert witness credibility in particular are not *actually* credibility findings, because when a trial court evaluates the credibility of an expert, it is "assess[ing]" the foundation on which the opinion is based, not making a finding as to the "personal credibility" of the witness. But see *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 375 (in appeal arising from denial of petition alleging ineffective assistance of trial counsel in violation of *Strickland* v. *Washington*, supra, 466 U.S. 686, habeas court's factual findings as to expert witness' credibility "will not be disturbed unless they are clearly erroneous" [internal quotation marks omitted]).

The majority's attempt to selectively categorize credibility findings as to expert witnesses as somehow distinct from all other credibility findings is simply not reconcilable with the way that a fact finder evaluates the testimony of witnesses, as it supposes that such a finding may be neatly dissected, somehow separating a fact finder's observations of the demeanor of a witness from its evaluation of the substance of the witness' testimony. The majority's standard is inconsistent with the fact that trial courts routinely instruct juries that they are to consider the credibility of expert witnesses in the same manner that they consider the credibility of any other witness. See *State* v. *Borrelli*, 227 Conn. 153, 174, 629 A.2d 1105 (1993); Connecticut Criminal Jury Instructions (4th Ed.) instruction 2.5-1, available at http://www.jud.ct.gov/JI/criminal/part2/2.5-1.htm (last visited March 27, 2015).

It is for the fact finder to consider that testimony,

using its " 'best judgment,' " and to determine whether to give any weight to the testimony, and, if so, how much weight to give to it. *State* v. *Borelli*, supra, 227 Conn. 174. A fact finder cannot determine credibility without considering demeanor, and, in the case of juries, they are specifically instructed to consider a witness' demeanor during testimony, regardless of whether that witness is an expert or lay witness. See Connecticut Criminal Jury Instructions (4th Ed.) instruction 2.4-2, available at http://www.jud.ct.gov/JI/criminal/part2/2.4-2.htm (last visited March 27, 2015). The majority's rule, which requires the habeas judge to say the magic word "demeanor," in order for this court to apply the standard of review we have applied without exception to a fact finder's credibility findings, is not only inconsistent with the way that our courts have understood the evaluation of the credibility of witnesses, and irreconcilable with the fact finder's discretion to disregard entirely the testimony of any witness, including an expert witness, it is divorced from the reality of what happens at the trial court level. It is irreconcilable with the fact that, pursuant to our criminal jury instructions, the fact finder, whether it be a judge or a jury, "may disregard the [expert's] testimony in whole or in part." Connecticut Criminal Jury Instructions, supra, instruction 2.5-1. This oversimplification reflects either an inability to understand or an unwillingness to acknowledge the nuances involved in the fact-finding process. The process of determining credibility is an exercise of human judgment that cannot be accomplished by reviewing a cold piece of paper, but that is the fiction upon which the majority's new standard is based.

In an attempt to blunt the argument of the dissenting justices in this appeal that the parties had no notice that the majority would abandon our established standard of review for credibility findings, the majority turns to the analysis of the Appellate Court, which it claims applied de novo review to the habeas court's credibility findings. There is no support whatsoever for the majority's reading of the Appellate Court decision, which merely concluded that "if" a jury on retrial were to credit both the testimony of the petitioner's burn experts and the testimony of Martin, then, the jury could have found "that it was temporally impossible for the petitioner to have committed the crimes for which he was convicted." *Lapointe* v. *Commissioner of Correction*, 138 Conn. App. 454, 479, 53 A.3d 257 (2012). The holding of the Appellate Court, therefore, is framed in the form of a hypothetical.[3] Id. That is, the Appellate Court did not answer the question of whether it is reasonably probable that a jury would credit the petitioner's new evidence. Accordingly, it did not apply any standard of review to the habeas court's factual findings. It simply concluded that *if* a jury were to credit that evidence, the jury could conclude that the petitioner had successfully

established an alibi defense. It is much more useful for the majority, however, to assert, without any support, that the Appellate Court applied de novo review, because that reading supports the majority's refusal to allow the parties to submit supplemental briefs.

The cornerstone of the majority's strategy, on both the procedural and substantive fronts, is its casual announcement that the applicable standard of review of credibility findings—but only as to expert credibility findings, and only in the *Brady* and *Strickland* contexts, and only when the habeas court omits to state expressly that it considered the demeanor of the witness—is de novo. As support for this jaw-dropping statement, which is directly contradicted by more than one century of binding precedent of this court, the majority cites to an intermediate appellate court in *Indiana*, which the majority apparently discovered after scouring every jurisdiction in the country for a decision that would provide support for its astonishing new rule. In connection with a claim based on newly discovered evidence, not *Brady* material, the Indiana Appellate Court stated in 2012 that it would not defer to a trial court's findings regarding the credibility of experts because that type of credibility determination is not based on a "first-hand evaluation of [the witness'] demeanor" but instead is grounded on an assessment of the credibility of the "foundation" of the expert opinion. *Bunch* v. *State*, supra, 964 N.E.2d 293. The majority opinion does not explain how we arrived in Indiana, or why we are ignoring the binding precedent of this court. See *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 375 (expert credibility findings in *Strickland* context reviewable only for clear error); *State* v. *Lawrence*, 282 Conn. 141, 157, 920 A.2d 236 (2007) ("it would be improper for this court to supplant its credibility determinations for those of the fact finder, regardless of whether the fact finder relied on the cold printed record to make those determinations"); *State* v. *Ortiz*, supra, 280 Conn. 720 (habeas court's factual findings regarding materiality in *Brady* claim subject to review only for clear error).

Perhaps most astonishing of all is the majority's failure to mention even once in its 123 page decision a recent *Connecticut* decision, which, like *Bunch*, discussed the appropriate level of deference afforded by this court to the credibility determinations of the trial court in considering a claim predicated on newly discovered evidence. See *Skakel* v. *State*, 295 Conn. 447, 991 A.2d 414 (2010). Not surprisingly, the majority in *Skakel* flatly rejected as "unprecedented" and contrary to our law; id., 487 n.25; the suggestion of the dissenting justice that this court should not defer to the trial court's credibility findings with respect to the videotaped testimony of a witness, where the trial court had expressly stated that because the witness had not testified at the hearing on the petition for a new trial, that court was "unable to

evaluate his 'demeanor and manner . . . .' " (Emphasis omitted.) Id., 630 (*Palmer, J.*, dissenting). The majority's dismissal of the dissenting justice's novel theory was not even remotely ambiguous—this court characterized that notion as one that this court "squarely has rejected . . . ." Id., 487 n.25. Yet, today's majority not only fails to distinguish this court's decision in *Skakel*—it does not even deign that decision worthy of mention, and instead relies on Indiana case law.

Nor does the majority explain how its reclassification of expert credibility findings made within the *Brady* and *Strickland* contexts somehow overcomes the jurisdictional bar established by our constitution, or why, for that matter, a different standard of review of credibility findings should apply in *Brady* and *Strickland* cases. Instead, the majority acts as though it just discovered an already existing rule dictating the standard of review, a rule that magically allows the majority to find facts without admitting that it is doing so. And the best part is that because this is not, according to the majority, a new standard of review, there is no need to allow the parties to brief the issue of whether the court should adopt a new standard.

With a single decision by an *intermediate* appellate tribunal in a different *state*,[4] the majority has solved two vexing problems—both the procedural problem of how to resolve the appeal on a claim raised sua sponte by this court without allowing the respondent to brief the issue, and the substantive problem of how to find facts, notwithstanding that doing so requires acting without jurisdiction in violation of our state constitution and ignoring legal precedent that has guided this court for more than one century. It is truly astounding, in light of the overwhelming authority cited by Justice Zarella in his dissenting opinion explaining the jurisdictional limits on this court's authority and documenting the many cases in which we have recognized and held ourselves bound by those limits, and in light of the fact that we recently and expressly rejected in *Skakel* v. *State*, supra, 295 Conn. 447, the very principles on which the *Bunch* court relied, that the majority has the audacity to deny that we have repeatedly rejected the very standard of review that it now claims is appropriate in the present case.

The answer to the majority's insupportable claim is simple and irrefutable. Our decisions and our state constitution, which clearly prohibit precisely what the majority does today—engaging in de novo review of the habeas court's expert credibility findings—are binding authority. When a decision from another jurisdiction, which constitutes persuasive authority only, is contradicted by our binding precedent, our decisions control. Instead of applying that principle of black letter law, the majority looks to Indiana for permission, finds facts and simply insists that it is not doing so. It applies an

astonishing new standard of review and pretends that the rule is well established. The majority raises a new claim sua sponte and expresses surprise when the dissenting justices cry foul.

Under these circumstances, it is unconscionable to fail to order supplemental briefing. The majority clumsily attempts to conceal the fact that it is adopting a radical new standard of review that is beyond the power and contrary to the very essence of this court, in order to justify revisiting the habeas court's factual findings in the absence of a claim of clear error, without allowing the respondent the opportunity to brief the issue. All the while, the majority acts as though there is nothing extraordinary in applying de novo review of factual findings. This sleight of hand is reminiscent of the Wizard of Oz exhorting Dorothy to "[p]ay no attention to that man behind the curtain!" At that point in the movie, no child was fooled, and the majority should not even try to convince itself that the reader will be fooled by its shell game.

The chilling aspect of the majority's brazen maneuver, however, is that we should have seen this coming. This court has been on a discernible path toward precisely this type of abuse of judicial power, and it began down that course by lightly tossing aside the rule of law in a case in which no necessity compelled such extreme action. Until recently, this court considered it to be a "bedrock principle of our adversarial system that courts decide only those claims that the parties have raised." *State* v. *Lenarz*, 301 Conn. 417, 532, 22 A.3d 536 (2011) (*Palmer*, *J.*, dissenting). Ironically, when *Lenarz* was decided, Justice Palmer took the majority to task for "[ignoring] this principle in resolving the present case on the basis of a claim that the defendant never has raised and that the state never has had a chance to address." Id.

Enter *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 123. In a stunning and unnecessary departure from this basic principle of appellate procedure, this court announced in *Blumberg* that pursuant to our supervisory power, we, and the Appellate Court, may set aside that "bedrock principle" and sua sponte resolve an appeal on an issue not raised by the parties. Id., 155. Perhaps in recognition of the fact that we were blurring the line between judging and advocacy, we limited our power by claiming that we would exercise it only upon the satisfaction of three conditions. First, there must be "exceptional circumstances" that justify reviewing the new issue.[5] Id., 128. Second, we must give the parties the opportunity to be heard on the issue. Id. Third, there must be "no unfair prejudice to the party against whom the issue is to be decided." Id. The court specifically emphasized that although all three conditions are necessary before we may sua sponte raise and consider a

new claim, "they are not alone *sufficient*." (Emphasis in original.) Id., 157. The decision also stated that the reviewing court raising a new claim may not rely on a general "in the interests of justice" explanation; id., 160; for the departure from the "general rule" that such claims are not reviewable. Instead, the reviewing court "should provide specific reasons, based on the exceptional circumstances of the case, to justify a deviation from the general rule that unpreserved [and unraised] claims will not be reviewed." Id., 161.

Despite this court's suggestion in *Blumberg* that it was simply making explicit what was already implicit in our decisions, reaction to the decision has ranged from surprised yet polite wariness to open dismay. See, e.g., C. Tait & E. Prescott, Connecticut Appellate Practice and Procedure (4th Ed. 2014) § 8-2:5, pp. 453–55 (describing *Blumberg* as "stunning" decision that "greatly expanded the right of the appellate courts to reach out and decide an issue that was neither preserved by the parties, nor raised on appeal," and expressing view that reviewing courts should exercise new authority under *Blumberg* "if at all, on exceedingly rare occasions," warning that "[o]nly time will tell as to whether *Blumberg* is the first step down an unwarranted path of issue spotting by appellate courts"); D. Klau, "Two Points Make a Line (And Suggest a Troubling Trend)," Appealingly Brief!, July 1, 2014, available at http://appealinglybrief.com/2014/07/01/two-points-make-a-line-and-suggest-a-troubling-trend (last visited March 30, 2015) (*Blumberg* and other decisions in which this court has exercised its supervisory authority suggest that this court "has abandoned longstanding norms that have governed the operation of our adversarial system of justice—norms like, '[i]t is a bedrock principle of our adversarial system that courts decide only those claims that the parties have raised'—in favor of a philosopher-king model of appellate judging"); C. Ray & M. Weiner, "*Mueller* v. *Tepler*, 312 Conn. 631 (2014): The Appellate Court Gets 'Blumberg-ed,' " Connecticut Lawyer, Vol. 25, No. 3 (October 2014), p. 31 (observing that "as the *Blumberg* vessel drifts into the murky waters of sua sponte identification and review of legal issues, the more tethered to the strictures set forth in *Blumberg* that the [c]ourt remains, the more comfortable we, as appellate practitioners, will feel").

Until today's decision, this court has waded only tentatively into the *Blumberg* waters. Since that decision was released last year, this court has invoked *Blumberg* three times, and has generally adhered to the guidelines established therein. See *Lane* v. *Commissioner of Environmental Protection*, 314 Conn. 1, 15–16 n.16, 100 A.3d 384 (2014) (resolving defendant's claim that we could not address question of whether statute retroactively applied to plaintiffs' conduct because it was not encompassed by certified question, on basis that proper construction of statute as applied to plaintiffs necessarily

must resolve question of retroactive application, but also noting in dictum our authority under *Blumberg*); *Mueller* v. *Tepler*, 312 Conn. 631, 643–46, 95 A.3d 1011 (2014) (allowing parties to brief unpreserved claim raised by plaintiff because Appellate Court ruling was reversible under plain error doctrine); *State* v. *Henderson*, 312 Conn. 585, 595–96, 94 A.3d 614 (2014) (sua sponte raising and allowing parties to brief issue of whether trial judge made finding that enhanced sentence was in public interest, on basis that claim was alternative ground for affirmance likely to arise on remand). Today, however, the majority reveals that it will no longer remain tethered.

Voltaire is credited with stating that with great power comes great responsibility. As the highest court in the state, it is undeniable that we have great power. *Blumberg* is rooted in our supervisory authority, which we historically have characterized as a power that should be used sparingly. See, e.g., *State* v. *Medrano*, 308 Conn. 604, 648, 65 A.3d 503 (2013) (*Norcott*, *J.*, concurring) ("[o]ur supervisory powers are invoked only in the rare circumstance where . . . traditional protections are inadequate to ensure the fair and just administration of the courts" [internal quotation marks omitted]). The reason for our restraint is obvious. On the one hand, our supervisory powers serve an essential purpose, reflecting our recognition that, although the rule of law ensures justice within the legal system, there are some instances when justice is more properly aligned with principles of equity. In those rare instances, the uniformity of legal rules must yield to equity, thereby achieving justice.

On the other hand, our extraordinary authority to act outside the limits of the rule of law is unquestionably a "great power," one that carries with it both great risk and attendant responsibility. Our supervisory authority allows us to reach down and announce a rule or result from on high. As the highest court in the state, once we have invoked that authority, our use of it is virtually unreviewable—with few exceptions, we are answerable only to ourselves. Accordingly, because of the lack of outside checks on that power, we have a duty to resort to that authority only when we must—disciplining ourselves to rely on it rarely. Otherwise, we risk injecting arbitrariness and capriciousness into the rule of law.

*Blumberg* runs afoul of these basic principles, and, in the present case, the majority takes another step down the dangerous path we have set for ourselves. The court in *Blumberg* exercised our extraordinary supervisory power arrogantly, without an awareness of its accompanying responsibility. The practical effect is obvious. By literally drawing a road map of all of the instances in which we now have given ourselves license to skirt around bedrock principles of appellate law, *Blumberg* encourages abuse of our supervisory author-

ity. Today's majority has accepted that invitation with abandon.

On one level, it is not surprising that *Blumberg* has led us to the abuse of power in the present case, where the majority has raised a new claim and then simply denied that it has done so. The habeas court's findings, if given the proper deference, would not support the result that the majority reaches today, so those findings cannot be allowed to stand. The majority, therefore, whips up a new rule that allows it to make its own findings, and contorts the respondent's routine and cursory assertion that the Appellate Court's decision cannot be reconciled with the applicable standard of review to constitute a *request* to this court to revisit that standard of review, notwithstanding the fact that we are constitutionally prohibited from doing so.[6] And the majority does it all without invoking *Blumberg* even once. As I mentioned earlier, the seeds were present in *Blumberg*, and we should have seen this coming.

On another level, however, today's decision could never have been foreseen, even by *Blumberg*'s most vocal critics. In *Blumberg*, this court revealed that it will dare to exercise its supervisory authority too broadly, too readily and too often. In today's decision, the majority reveals that not even a jurisdictional bar in the state constitution will stand between it and what it views as a just result. No one could have imagined that within one year, *Blumberg* would seem to be a relatively modest abuse of power.

The majority's unwillingness to abide even by the modest constraints on its power set forth in *Blumberg* appears to stem from a lack of impartiality, evident from the language of the opinion itself. From the outset, it is clear that the lens through which the majority focuses on the facts of the case is obscured by its apparent bias in favor of the petitioner. I will not undertake a detailed critique of the majority's discussion of the merits of the petitioner's appeal. As I have stated, Justice Zarella already has accomplished that task admirably in his dissenting opinion. I emphasize only some aspects of the majority's discussion in order to highlight the fact that the majority's determination to ignore the rule of law today is driven by the result that it sought from the beginning, handing a get out of jail free card to a man who the majority apparently has become convinced is innocent, despite the fact that the majority was not present at the original trial or at any of the habeas trials. I am mindful of the principle that in dissecting the majority opinion to demonstrate its bias, I am limited, as are we all, by the fact that one can never "[look] into another's mind" to know that person's intent. See Connecticut Criminal Jury Instructions (4th Ed.) instruction 2.3-2, available at http://www.jud.ct.gov/JI/criminal/part2/2.3-2.htm (last visited March 30, 2015). Absent a statement setting forth a person's intent,

we always must rely on inference to discern it. I therefore look to what was said, and to what was not said, as evidence of the majority's bias.

I begin with a few examples of the slanted language employed in the majority opinion. Despite never having met the petitioner, the majority states that "he seemed physically, mentally and temperamentally incapable of the brutal crime." The majority attempts to justify its disregard for the rule of law by referring to "the sinking discomfort that comes with the realization that an injustice may have occurred." In referring to the Ludlow note, it is not sufficient for the majority to refer to it as merely exculpatory evidence—it labels it "exonerating . . . ." As for the content of the note, which consisted of the cryptic notation "30–40 mins. [p]oss.," the majority asserts that this vague notation constitutes "details" concerning the length of time that the fire burned in the victim's apartment, and that the note was "consistent" with the testimony of the petitioner's two experts during the habeas trial. The majority also claims that the police "focused their suspicions" on the petitioner, rather than their investigation.

Apparently, deeming the term "confession" to be too negative, the majority characterizes the petitioner's three confessions admitting that he raped and killed the victim and then set fire to her home, as "suspect admissions," in which he "purported" to take responsibility for the crime. If all of this does not clarify for whom the majority speaks, one need only review part I of the majority opinion, the facts section, which includes as a statement of fact the argument of the petitioner's trial counsel that his confessions "were the product of a highly manipulative interrogation of an extremely vulnerable and impaired man, who had spent his entire life accommodating and agreeing with others in an effort to gain favor and to avoid conflict." These confessions are the very same ones that this court upheld on appeal. *State* v. *Lapointe*, 237 Conn. 694, 730–35, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

In a striking display of its utter loss of perspective regarding the role of this court and the functioning of our system of justice, the majority makes several statements that suggest it is willing to step beyond even the role of advocate, and take a thirteenth, oversized seat in the jury box. For example, in regard to the petitioner's confessions, the majority states: "Indeed, no fair-minded person who is familiar with the evidence in the present case can read the petitioner's statements and feel confident that they represent a true and accurate account of the victim's murder by the person responsible for her death." I can think of a group of people who, after months of listening to evidence, *did* have such familiarity and *did* have such confidence: *The jury of the petitioner's peers*. The majority repeatedly

ignores the fact that the petitioner had the opportunity to present whatever evidence he chose in support of his defense, to a jury that he agreed would be fair and impartial. In front of that jury, the petitioner had the opportunity to confront the witnesses against him, and to argue his theory of the case through counsel. That jury, unlike the majority, heard all of the evidence and convicted the petitioner.

In another illustration of the same problem, the majority first briefly catalogues some of the evidence relied on by the state at the petitioner's trial, including: upon supposedly discovering that the victim's apartment was on fire, the petitioner took a longer route than necessary to use the neighbor's telephone; when he used the neighbor's telephone, he called his wife and the victim's daughter instead of the police; he claimed that the door to the victim's apartment had been locked, but it was not; he repeatedly asked the police over the years whether he was a suspect in the case; and, he gave conflicting accounts about how often he had left his home and how often he had seen the victim on the day of the murder. Astonishingly, the majority then states: "Suffice it to say that we do not believe that a jury would necessarily find any of this conduct particularly odd or suspicious, even for the average person, and would likely find it much less so for the petitioner," despite the fact that a jury *already has found* all of this behavior, taken together with a confession, to be quite a bit more than odd and suspicious. Indeed, the jury found it to be proof of *guilt* beyond a reasonable doubt.

The majority's brief catalogue of the state's evidence further serves as an illustration of the primary method by which the majority tries to dilute the strength of the state's case against the petitioner in the original trial in order to bolster the materiality of the Ludlow note. Rather than consider all of that evidence together, the majority addresses it piecemeal, as demonstrated by the majority's suggestion that the conduct listed in its brief catalogue should be evaluated without reference to the fact that the petitioner confessed to the crime. The majority uses this device repeatedly in its evaluation to exaggerate the weaknesses and minimize the strengths of the state's case.

In addition to considering the state's evidence in a piecemeal fashion, the majority unabashedly considers information that was not presented at the original trial or to the habeas court on the petitioner's second habeas petition, such as the opinion of Richard Leo, a professor who testified regarding false confessions in support of the petitioner's unsuccessful actual innocence claim in his first habeas trial. Leo's opinion has no bearing on the materiality of the Ludlow note. The majority claims that it is aware that its "focus, of course, is the import of the burn time evidence relative to the strength of

the [state's] case," but, nevertheless, "recite[s]" Leo's statements to underscore *its* finding that the confessions were unreliable. See footnote 86 of the majority opinion. Related to the majority's improper reliance on Leo's opinion is its perplexing discussion of the research it has reviewed regarding the problem of false confessions, research that was never presented or considered in connection with the second habeas petition.[7] The majority fails to provide any explanation as to how its research is connected to this appeal, reinforcing the conclusion that the majority is simply convinced that the petitioner's confessions were false, and therefore the majority is authorized to act outside the rule of law. Additionally, by offering up the research that it has itself reviewed, the majority appears to be trying on yet another hat, that of an expert witness.

The majority also relies on certain testimony that the petitioner unsuccessfully had offered in support of his ineffective assistance of counsel claim in his first habeas petition, specifically, the testimony of a Manchester resident that saw someone running from the area of the crime scene at approximately 8 p.m. on the night of the murder. That testimony has no bearing whatsoever on the strength of the state's case, notwithstanding the majority's sly remark that it will not comment on the admissibility of this testimony at a new trial. The first habeas court made a factual finding that the petitioner had failed to establish a link between the unidentified runner and the crime. Presumably, that finding will stand absent a successful claim of clear error. See *State* v. *Arroyo*, 284 Conn. 597, 609–10, 935 A.2d 975 (2007) (explaining that proffered evidence of third-party culpability is inadmissible if that "[e]vidence . . . would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense").

The majority's reliance, in its assessment of the strength of the state's case, on information that was never introduced into evidence at trial is even more astonishing when considered in conjunction with the majority's selective failure, in that same assessment, to give weight to evidence that was actually presented by the state at trial. Most notably, the primary basis on which the majority concludes that the state's case against the petitioner was "tenuous," is its finding that the petitioner's confessions were false. In making its case, the majority relies heavily on the fact that the petitioner, who has an IQ of 92, suffers from Dandy-Walker syndrome. The petitioner's trial counsel, however, presented ample evidence of his mental disability at trial in an attempt to call into question the voluntariness and reliability of his confessions, including the testimony of a clinical psychologist and a psychiatrist who both testified, over the course of five days during the trial, regarding the petitioner's mental disability. The jury also had the opportunity to consider this evi-

dence in the context of its observations of the petitioner's testimony over the course of three days, and his demeanor during the two months of trial. The jury considered that evidence and concluded nonetheless that the confessions were both voluntary and reliable.

The majority also contends that the testimony offered by the state at trial detailing the petitioner's police interview and resulting confessions "provides significant insight into . . . the petitioner's state of mind during questioning." I agree that the testimony provides insight into the petitioner's state of mind. I observe that the jury obviously drew different inferences than those drawn by the majority, which, once again, reveals its apparent bias through its slanted account of the evidence. Specifically, although the majority acknowledges that the petitioner himself explained to Detective Paul Lombardo of the Manchester Police Department the reasons for his reluctance to provide the details of his crime, the majority substitutes its own theories as to why the petitioner vacillated. The petitioner was very clear about the basis for his resistance to providing details—he did not want people to view him as a "sex fiend" and was concerned that Martin would leave him once she found out what he had done to her grandmother, the victim, Bernice Martin. The logic of the petitioner's thinking is fairly compelling—brutally raping and murdering the eighty-eight year old grandmother of your then wife, then setting a fire to destroy the evidence, is horrific. It is one thing to confess to doing it; it is quite another to state out loud the details of what you did, knowing that whatever you say will become public knowledge.

The petitioner's thinking reveals a level of sophistication that is inconsistent with the majority's portrayal of him as "slow-witted, easily confused, child-like and gullible . . . ." As the habeas court observed following its review of the trial transcripts, a reasonable interpretation of the petitioner's confessions is "that the petitioner intentionally gave the police a mixture of both truthful and misleading information. The petitioner's behavior may be nothing more than manipulation and duplicity." That court further observed that its "thorough review of the transcripts of the petitioner's testimony, both during the trial and the extensive motion to suppress hearing, reflect an individual who answered questions quite well but nevertheless was often evasive, selective in his recall and bordering on so incredible as to be not believable . . . ."

Both the majority and the concurring opinions rely on the fact that some of the details of the petitioner's third, more detailed statement to the police were not corroborated by the evidence at the crime scene. For example, both opinions point to the fact that the petitioner incorrectly described the method of strangulation and the clothing the victim had been wearing on

the night of the murder. It is ironic that the majority and the concurring opinions have such high expectations of the petitioner's ability to recall details two years after the crime, considering much of their theory of the case depends on their view that the petitioner suffers from a mental disability so severe that it renders his confession involuntary.

Consistent with the petitioner's statements that he was withholding information because he was concerned with the consequences, he provided his most detailed confession only after he had been assured that Martin had been informed that he had committed the crime, and that she still supported him and would stand by him. In a masterful display of advocacy, however, the majority decides not to accept the petitioner's own explanation as to why he was withholding details and vacillating during the interview. Instead, the majority supplies its own explanation for the petitioner's evasiveness, postulating that his resistance supports the conclusion that the confessions were false.

It is also significant that the majority dismisses out of hand a powerful piece of corroborative evidence relied on by the state at the petitioner's original trial. The majority summarizes that evidence very briefly, acknowledging that the state relied on the fact that, "before any information regarding a possible sexual assault became known to the police or the public, the [petitioner] stated in a conversation with . . . a friend of the Lapointe family . . . that 'it was a shame they killed an old lady, but they didn't have to rape her, too.' " *State* v. *Lapointe*, supra, 237 Conn. 699. The majority then opines that the petitioner's testimony at trial offered a perfectly good explanation as to how he came by that information—the petitioner stated that he had overheard this information *at the hospital.* As elsewhere, the information omitted by the majority reveals its true agenda. This court summarized the relevant facts: "When asked in a June, 1989 interview by [Lombardo] how [the petitioner] had learned that the victim had been sexually assaulted, the [petitioner] responded that he had been informed by a doctor at the hospital on the night of the murder that the victim had been strangled, stabbed and sexually assaulted. The medical personnel who had attended to the victim unanimously testified, however, that they did not check the victim for sexual assault trauma when she was at the hospital that night and, further, that it would have been highly unusual for them to have done so under the circumstances. Other family members who had been present at the hospital corroborated the testimony of the medical personnel who said that there had been no mention of sexual assault at the hospital." Id., 699–700. The majority ignores the weight of the testimony regarding what was revealed at the hospital, and instead highlights the testimony of a single witness that supports its conclusion. This is advocacy, not adjudication.

Perhaps the most deceptive aspect of the majority opinion is its failure to give any weight to the fact that the petitioner *did* present expert testimony at the original trial regarding the burn time of the fire. The majority strategically mischaracterizes that testimony in considering the petitioner's *Brady* material in the context of the evidence presented at the original trial. Specifically, at trial, the *petitioner* called Christopher Marvin, who had served with the Manchester Fire Department for twenty-two years, the last nine or ten years of which he had held the rank of Deputy Fire Marshal. Although the majority dismisses Marvin by stating that he was "not a professional firefighter much less a forensic fire expert," Marvin was a certified fire marshal who completed an initial 160 hours of required training, and maintains certification by completing ninety hours of required training every three years. He testified that he had taken arson and fire investigation courses through the state fire marshal's office, the national fire academy and also through college courses. At the time of trial, he was attending college working toward his degree in fire science. Considering Marvin's long years of service as a fire marshal, as well as his extensive training, the majority's reliance on his status as a volunteer is deceptive by misdirecting the reader from what is important, that is, his education and experience as a fire marshal. Marvin was qualified to offer an expert opinion, and he did.

As part of its effort to downplay the significance of Marvin's trial testimony, the majority flatly misrepresents it, suggesting that the petitioner did not call him in order to question him regarding his investigation of the fire, and implying that he was questioned regarding the fire's burn time only during redirect examination. He was questioned extensively regarding his investigation of the fire during direct examination by defense counsel, and he testified specifically regarding his conclusions, based on the evidence that he had observed, regarding the burn time of the fire.

Marvin testified regarding his investigation of the fire, the likely temperatures inside the apartment during the fire, the rate at which the fire burned, and his conclusions about the fire's burn time. Significantly, *during direct examination* by the petitioner's trial counsel, Marvin testified that he estimated that the fire had burned for approximately fifteen to twenty minutes before it reached its "highest heat buildup" at approximately 8:10 p.m. That time frame corresponds, in all material respects, to the time frame mentioned in the Ludlow note and the estimates given by the petitioner's new burn time experts. During cross-examination, Marvin admitted that his estimate was rough and that the state fire marshal who investigated the fire, Stephen Igoe, was of the opinion that a burn time could not be determined. Although the majority relies on Marvin's

characterization of his estimate as a rough one in its attempt to discount his testimony, his admission during cross-examination that the number of variables involved in determining the burn time of a fire makes *any* estimate a rough one is consistent with the habeas court's factual finding that a burn time could not be estimated with precision—of course, the majority cannot mention this fact, since it is assiduously pretending that the habeas court did not make that factual finding. Marvin's conclusion that it was not possible to offer more than a very rough estimate was shared by the other two fire investigators, Igoe and Joseph Roy, who, he testified, also did not draw conclusions as to any particular temperature range. Marvin explained on redirect examination that the reason that his estimate was very rough was because certain testing that could have been performed at the scene—computer modeling and computer testing, which would have permitted the investigators to determine the exact temperatures of the fire—had not been performed.

The majority also conveniently ignores the fact that Marvin provided a very specific basis for his estimation of the burn time, stating that he observed that there were heat buildup marks on the kitchen clock that had occurred when the clock hands had been at 8:10 p.m., leading him to conclude that the heat had reached maximum temperature at that time. He based his burn time estimate on that specific observation, which he stated provided a "base point" for determining the burn time of the fire.

On redirect examination, the petitioner's trial counsel asked questions to expand on Marvin's qualifications as a fire investigator, asked a number of questions about the scientific basis for his estimates, and also asked about the fire's burn rate and, again, about his burn time estimate. Accordingly, the principal aspects of the fire discussed during Marvin's testimony at the criminal trial (peak temperatures, significance of the smoke damage, materials in the couch, speed at which the fire burned on the couch, and duration of the fire) were essentially the same facts disputed among the new burn time experts almost two decades later at the habeas hearing. The best that can be said, therefore, about the petitioner's *Brady* claim, is that he contends that had the Ludlow note been disclosed to him, he would have presented *different*, and in his view, *better* expert witnesses to testify as to the burn time of the fire, in effect getting a second bite at the expert apple. Presumably, in weighing the effect of the *Brady* material, the majority should have considered that an expert already testified to exactly what the petitioner now claims he would have an expert testify. The majority's treatment of the petitioner's expert testimony, however, suggests that this argument would be entirely new, provides yet another demonstration of the majority's assumption of the role of advocate on behalf of the petitioner.

Ultimately, the most important question that the majority must answer is this: Why is the Ludlow note sufficient to undermine its confidence in the jury's verdict? No one contends that the note has any independent significance. Indeed, no one actually knows what the note means. And the testimony of the petitioner's experts regarding the burn time of the fire, standing on its own, is irrelevant to the case. It is important to recall that the *only* reason that the Ludlow note and the testimony of the petitioner's experts are relevant at all is because they lead to the potential alibi testimony of Martin. An assessment of her credibility is crucial to the materiality of the petitioner's *Brady* claim, which is the only issue in this case. The significance and persuasive force of the petitioner's burn time estimates rise and fall on the strength of Martin as a witness. Unfortunately for the petitioner, the habeas court found Martin to be a terrible witness.

Although the majority claims that the resulting alibi defense that the petitioner would be able to assert at a new trial, predicated on the testimony of the new burn time experts and Martin, would constitute "a complete and potentially compelling alibi," that claim is not supported by the habeas court's credibility findings as to Martin. Martin testified before the habeas court in this matter, so the habeas judge had the opportunity to evaluate her credibility and the substance of her testimony. The court expressly found that Martin's testimony *did not* provide the petitioner with "anything that remotely amounts to an alibi." During the habeas hearing, Martin repeatedly testified that she does not remember details from the day of the murder, she appeared easily confused during the questioning, and she contradicted some of her earlier testimony from the suppression hearing.

At one point during the hearing, Martin indicated that the petitioner may have, in fact, been out of the house walking the dog when she came downstairs after bathing her son. When asked where the petitioner was when she was bathing her son, Martin replied: "I don't know. I didn't—I don't know. I went up to get Sean, my son, ready, and I got him ready for bed. When we came down, he wasn't there, so I think he took the dog. I don't know. I'm—don't want it—I don't actually know if—you know he went out. He probably went—could have—he could have gone for a walk." When the petitioner's counsel began to ask a follow-up question to this answer, Martin interrupted and said: "Or I don't know where he was." After showing Martin her prior testimony from the suppression hearing, in which she had testified that the petitioner was at home when she came downstairs, the petitioner's counsel asked her whether the petitioner was at home, and she replied: "If he was there when I came downstairs, I came down probably about the time my aunt called and then he

just left and went to my grandmother's. If I—I'm saying, I'm not—you know I'm not 100 percent positive."

The habeas court found Martin's testimony to be "harmful to any alibi defense premised on [her testimony]. . . . [Martin] testified that she did not know whether [the petitioner] had been in the house (on the night of the murder) while she was upstairs, if the petitioner had been outside she would not have known, and that she had no way of knowing if he had left the house. It is difficult, if not impossible, to conclude that [Martin's] presence on another floor, while giving her son a bath, not seeing or hearing the petitioner downstairs . . . provides the petitioner with anything that remotely amounts to an alibi."

The habeas court's finding regarding Martin's lack of credibility as a witness is devastating to the majority's conclusion that the petitioner has satisfied his burden to prove the materiality of the Ludlow note. It is astonishing that the majority has expended so much time and effort in 123 pages arguing that the petitioner should be able to present the "new" burn time evidence, and has crafted a brand new rule for reviewing determinations of expert credibility, specifically so that the petitioner can present Martin's "compelling" alibi testimony. At the end of the majority's yellow brick road is Martin—who is not, by the way, an expert witness, so the majority's new rule does not apply—and who has been found by the habeas court, as a matter of fact, to *lack credibility*. Always prepared, however, the majority simply employs its favorite strategy for dealing with problematic findings—it simply pretends that the habeas court did not find that Martin lacked credibility. The majority's failure to address, even once in its lengthy discussion of materiality, the habeas court's crucial finding that Martin lacked credibility, provides further evidence for my conclusion that the majority began not with the applicable legal principles, but with its apparent conviction that the petitioner is innocent.

The majority's transparent advocacy merely illustrates the greater danger presented by today's decision. The majority acts without jurisdiction, flouts precedent of this court from the prior two centuries, sandbags the respondent, alternately ignores inconvenient findings by the habeas court (i.e., the habeas court's finding that the burn time could not be determined with precision, and its finding that Martin was not credible) and fails to accord deference to the remainder of those findings (i.e., the habeas court's expert credibility findings), and brazenly insists that it is acting within the rule of law. And today's decision does not stand in isolation, but is part of an emerging and disturbing pattern in this court's jurisprudence, beginning with *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 123, and leading us to this point.

Today's decision could be viewed as illustrating precisely the type of "subtle [distortion] of prejudice and bias" of which Rawls warned, thus giving rise to a risk of the appearance of impropriety. J. Rawls, supra, § 38, p. 235. Prejudice and bias can discriminate against groups not only by departing from the impartial rules to apply a more negative rule to a certain group, but also by a departure from those rules, as in the present case, to apply a more favorable rule to a single individual. While bestowing a benefit that is not required by and contrary to the rules on an individual may appear to be benign, the flaw in that overly simplistic view is demonstrated by comparing the case of the fortunate individual to others who did not benefit from the special treatment.

In the present case, in an extreme departure from the impartial administration of public rules, the majority does not defer to the credibility findings of the habeas court. The majority bobs and weaves its way around the applicable standard of review, obfuscating its distortion of the law in a manner that somewhat conceals the drastic nature of its departure from those rules. Ironically, the Chief Justice, by succinctly stating the new standard in her concurring opinion—namely, that we properly may revisit the findings of the habeas court because: (1) its credibility findings are not "ultimate" factual findings, but rather assessments of whether there is a reasonable probability that a jury could credit the testimony of the witnesses; and (2) because the habeas court did not expressly state that it relied on the demeanor of the witnesses, allowing this court to infer that it relied only on the substance of their testimony—highlights what the majority opinion obscures. Not only is this standard of review new, it is an outlandish distortion of basic principles of appellate procedure and is pretextual in nature. The Chief Justice cites to no authority in support of the rule, for the simple reason that none exists. This is a made up rule that benefits one person—Richard Lapointe.

Although the majority and concurring opinions contort both logic and the law in order to justify their departure from hitherto unquestioned rules of appellate procedure, this court, in a decision affirming the judgment of the Appellate Court, very recently rejected an invitation from a different petitioner to do precisely what it does today. See *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 602 n.12, 611 and n.16, 103 A.3d 954 (2014). As Justice Zarella emphasizes in his dissent, this court in *Sanchez* properly adhered to the established rule that whether there is a reasonable probability that a new jury would credit new witness testimony presents a question of fact for the habeas court that we review only for clear error. In adhering to this principle, we specifically considered and properly rejected, in a unanimous decision, the reasoning of the

dissenting judge at the Appellate Court; id., 602 n.12; who had drawn a distinction between a traditional credibility determination, as made by a jury, and the credibility determination made by a habeas court, which he characterized as merely "assessments of the likelihood" that the jury would credit the witnesses. *Sanchez* v. *Commissioner of Correction*, 138 Conn. App. 594, 605 n.2, 53 A.3d 1031 (2012) (*Sheldon, J.*, dissenting).

Our proper refusal to depart from the impartial and regular administration of the applicable legal principles as to Jorge Sanchez, the petitioner in *Sanchez*, stands in sharp contrast to the special rule that the majority has made up in the present case for Richard Lapointe, whose case has been a cause célèbre for decades. I emphasize that our decision in *Sanchez* was proper—it is only when contrasted with the majority's superhuman efforts to benefit the petitioner in the present case that our adherence to the law in *Sanchez* casts light on the unfairness of the majority's manufactured rule in the present case. Undoubtedly, Jorge Sanchez would have welcomed a court that saw fit to depart from the rules in order to benefit him individually. Instead, he received the impartial administration of the applicable legal rules, which meant that this court and the Appellate Court properly deferred to the habeas court's credibility findings. Indeed, Jorge Sanchez might well ask: "If this is not a new rule, why was it not applied to me?"

I do not offer my observations of the majority opinion, or of our prior precedent, lightly. I do so because I owe a duty to this court and to the rule of law. I believe that *Blumberg* was an ill-conceived exercise of our supervisory authority, and the abuse of power accomplished by the majority's decision today makes *Blumberg* appear tame by comparison. These decisions jeopardize the faith of the bar and the public in this court as an institution that serves the law, rather than rules over it. This court has been following an alarming path. We have done damage to the rule of law, which we have a duty to protect. At this point, we have a choice: Shall we crown ourselves as philosopher-kings or resume our proper role as servants of the law? One can only ask where the path will lead to next.

[1] The "Ludlow note" is a note authored by Detective Michael Ludlow of the Manchester Police Department containing the following notation: "30–40 mins. [p]oss."

[2] I observe that courts routinely instruct juries that innocence is not for them to decide. The only question in a criminal trial is whether the state has proven a defendant guilty beyond a reasonable doubt. That is exactly what the state did at the petitioner's original trial twenty-three years ago, and the petitioner has not offered any evidence sufficient to undermine confidence in the jury's verdict.

I also observe that the Appellate Court concluded that the habeas court properly rejected the petitioner's claim of actual innocence, and that the question of whether the petitioner proved his actual innocence claim is not before us in this certified appeal. *Lapointe* v. *Commissioner of Correction*, 138 Conn. App. 454, 456, 53 A.3d 257 (2012).

[3] The majority objects vociferously to Justice Zarella's objective and uncontroversial characterization of the Appellate Court holding, which is consistent with my reading of the decision. The majority claims that this

very straightforward reading of the decision is "absurd" and "verges on insulting" because such a reading would draw the inference that the Appellate Court incorrectly applied the *Brady* standard. The majority's outrage is ironic considering that the majority is importing to the Appellate Court an intent to review factual findings de novo.

[4] In a footnote, the majority also discusses a decision of the Appellate Division of the New Jersey Superior Court. See *State* v. *Behn*, 375 N.J. Super. 409, 868 A.2d 329, cert. denied, 183 N.J. 591, 874 A.2d 1108 (2005). See footnote 41 of the majority opinion. Because that case is not on point, I need not address it.

[5] Of course, the fact that there were no exceptional circumstances justifying a departure from the established rules in *Blumberg* itself sent a signal that did not go unnoticed. See C. Tait & E. Prescott, Connecticut Appellate Practice and Procedure (4th Ed. 2014) § 8-2:5, p. 455 ("The controversy in *Blumberg* arose [out of] a private insurance dispute between the parties, and the issue raised sua sponte involved an application of an established common-law contract doctrine called 'prevention.' Thus, the issue raised did not appear to have substantial public importance that extended beyond the parties, and any lack of clarity regarding the prevention doctrine could await refinement in a later case in which the parties had raised the claim and the trial court had decided it.").

[6] The majority claims that it "defies credulity to assert [as do the dissenting justices] that the respondent was not on notice that we would decide the claim . . . ." The best answer to that accusation is the respondent's brief, which merely asserts that the Appellate Court's conclusion cannot be reconciled with the applicable standard of review, and devotes a paragraph to citing case law that sets forth the proper standard. Litigants include this type of material in briefs to this court as a matter of course and as part of their due diligence. The respondent's assertion that the Appellate Court decision is inconsistent with the standard of review cannot reasonably be read to constitute an invitation to this court to reconsider that standard. Indeed, it would be absurd for the respondent to request that this court revisit a favorable standard of review.

[7] I observe that the Chief Justice agrees with me in her concurring opinion on at least this most uncontroversial and obvious point, that the majority's reliance on research that was never considered at the original trial or by the second habeas court is improper.

---